**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

GARY SMITHERMAN,          )
                          )
           Plaintiff,        )
                          )
v.                          )         Civil Action No.  2:12cv184-WHA
                          )
CONSUMERS INSURANCE USA, INC.,  )        (wo)
                          )
                          )
           Defendant.     )

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This cause is before the court on a Motion for Summary Judgment (Doc. #17), filed by Consumers Insurance USA, Inc. on January 9, 2013.

The Plaintiff, Gary Smitherman ("Smitherman"),  filed a Complaint in this court on February 28, 2012.  He brings claims for breach of contract (Count I) and bad faith refusal to pay a claim (Count II).

Smitherman is a citizen of Alabama, and the Defendant Consumers Insurance USA, Inc. ("Consumers"), is a citizen of the State of Tennessee.  Smitherman has claimed damages for the theft of a vehicle and for punitive damages.  This court has diversity subject matter jurisdiction. *See* 28 U.S.C. §1332.

Consumers has moved for summary judgment as to both counts in the Complaint.

For the reasons to be discussed, the Motion for Summary Judgment is due to be GRANTED in part and DENIED in part.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1)(A),(B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

Smitherman is an insured under a business automobile policy of insurance issued by Consumers.  The policy covered a 2008 Nissan Pathfinder owned by Smitherman.

Smitherman's son, Shane Callis ("Callis") was working for Smitherman in Smitherman's commercial and residential glasswork business.  During that time, he was living with his grandmother in Montgomery, Alabama on weekends.  On January 6, 2012, Callis asked to borrow the covered vehicle to visit his children at his grandmother's house.  Smitherman agreed to allow Callis to use the vehicle, but specified that Callis was to return the vehicle no later than 9:00 p.m. the same day.  Callis drove the vehicle away and did not return by 9:00 p.m.

When Callis did not return with the vehicle, Smitherman contacted Callis's grandmother, but Callis was not at the house.  Smitherman was unable to locate or talk to his son at that time.

On January, 9, 2012, Smitherman contacted the Montgomery, Alabama Police Department and also his Consumers insurance agent about the missing vehicle.  The insurance sales agent advised Smitherman to delay reporting the claim to see if the vehicle might be recovered.

Smitherman spoke to Callis's uncle and was told that Callis said he had parked the vehicle at a dry cleaners, had gone to a party, lost the key, and the vehicle was gone when he

returned to where he had parked it.  Callis's uncle stated that Callis was acting as if he were on drugs and that Callis told him that the key to the vehicle had dropped out of a hole in his pocket at the party.  (Doc. #19-20 at p.40:6-19).  Callis later told Smitherman the same thing.

Sergeant Hall of the Montgomery Police Department contacted Callis in response to Smitherman's complaint.  Callis told the Montgomery Police Department that he had loaned the vehicle to a man named George, and George had not returned it.

On January 24, 2012, Smitherman contacted Consumers to file a claim.  The claim was initiated that day, and the claims adjuster, Georgia Hemrick ("Hemrick") called and got a recorded statement from Smitherman at 9:35 a.m.[1]  (Doc. #17 at p.89).

In the transcript of the first recorded conversation between Smitherman and Hemrick, Smitherman told Hemrick that he had allowed Callis to borrow his vehicle to see his children and to come straight back after that, and that was the last time he saw the vehicle.  He said that Callis had told the police that he left the vehicle parked, went off with a friend, and when he came back, the vehicle was gone.  (Id. at p.52).   Smitherman agreed that the situation sounded "fishy," and that it was embarrassing that his son did not call him about the car being missing.  (Id.).   When asked whether the son had been charged with theft, Smitherman said he had been charged with unauthorized use.  (Id. at p. 54).  Hemrick told Smitherman that it would take a while to get the investigation of the claim underway.  (Id. at p.56).

The claim log indicates that at 2:45 p.m. that same day, Hemrick noted that "due to the

---

[1] No party has objected to the admissibility of evidence from the insurance claim log, transcripts of recorded conversations, or the content of those conversations.

4

fact that the insd gave the uld[2] permission to use his vehicle this does not constitute a theft claim." She also noted that she had discussed the claim with her supervisor, determined that she would send a letter and call the insured to inform him that his claim "does not meet the definition of theft," and that she would close the file until she spoke to Callis.  (Id. at p.89).

Hemrick's January 24, 2012 letter was called a "Reservation of Rights Letter."  In the letter, Hemrick stated that they are investigating "this incident under a reservation of rights for Late Report/Non Cooperation from unlisted driver."  Below her signature line, Hemrick noted as follows: "Please also be advised that due to the fact that you gave the unlisted driver permission to use the vehicle in question and due to the fact that he is not cooperating with this investigation, this loss is not considered a theft. Therefore, we will be closing the file until we hear from the unlisted driver and receive full cooperation from the unlisted driver."  (Doc. #19-3 p.2).

At 3:05 p.m. on January 24, Hemrick contacted Callis, who hung up on her.  She called the number two additional times, was hung up on by a woman who answered the second time, and finally left a message on an answering machine.

At 3:18 p.m., Hemrick called Smitherman and told him that Callis was not cooperating, and noted that Smitherman said that he was "having the same problem."  Hemrick also noted in the claim log that she has to close the claim, but "will call the police officer to see if I can find out anything." (Doc. #17 at p.89).

At 3:25 p.m., Hemrick contacted the Montgomery Police Department.  Hemrick noted in the file that Sergeant Hall was told by Callis that he had lent the vehicle to a person named

---

[2] Unlisted driver.

George, that he did not have a last name or address for George, and that Sergeant Hall could not

"issue a warrant or theft report because of lack of cooperation and information."  (Id. at p.88).

Hemrick had a copy of the Alabama Uniform Incident/Offense Report at that time.

At 3:44 p.m., Hemrick made a notation as follows: "please close subro and file. This does

not meet the definition of a theft."  (Id.).

At 4:08 p.m., Callis contacted Consumers and gave a statement to Kevin Sloan ("Sloan"),

Hemrick's supervisor.  The claim note states that Sloan explained that a Reservation of Rights

letter was being sent to Smitherman stating that the facts do not support a theft because the

vehicle was given with permission.  (Id.).   In the transcript of the recorded call, Callis told Sloan

that he drove the car to his house, then he went to a party, and then he let a friend of a friend use

the car, but it turned out that the friend did not really know the person to whom Callis loaned the

car.  (Doc. #17 at p. 61-62).  Callis also stated that George was just supposed to use the vehicle

for a "five minute run to the gas station." (Id. at p.59).  Callis told Sloan that George was going

to run to the store, and Callis needed something from the store, so he lent George the vehicle.

(Id. at p.62).  The transcript of the call also includes Sloan's statement that he would to have to

"check with legal" about whether there are any cases that indicate that the circumstances of the

claim constitute theft. (Id. at p.63).

At 4:08 p.m., Sloan also noted that he "called DA Wells and LM for him to call me to see

if any cases in state with similar facts were looked upon as thefts," but there is no indication that

any information was received by Sloan.  (Id. at p.88).

On January 25, 2012, Sloan and Hemrick noted in the log the definition of "theft" from

law.com.  (Doc. #19-11 p.2).  On January 27, 2012, Hemrick entered a file note that the file was

closed.  No additional correspondence was sent to Smitherman informing him that his claim was denied.

Smitherman made an additional police report with the Chilton County Sheriff's Department on February 2, 2012.

On February 13, 2012, Consumers received a letter from Smitherman. (Doc. #19-19 at p.60:3-7).  In the letter, Smitherman asked whether the language at the end of the January 24 Reservation of Rights letter meant that his claim had been denied.  The claim log contains a notation from Sloan on that day stating that Consumers needs "to send formal denial.  Attaching wording at the end of the ROR does not meet the requirement."  (Doc. #17 at p. 87).  A formal denial letter dated February 14, 2012 was sent to Smitherman which references a portion of the Alabama Criminal Code on the "theft."  In the letter, Hemrick advised that the loss did not fall under the definition of a theft because Smitherman had given the keys to the vehicle to his son and his son said that he had given the keys to someone named George to use the vehicle (Doc. 17-1 at p.32).

Smitherman filed suit on February 28, 2012.

The vehicle was subsequently recovered by the police[3] and the person in possession of the vehicle had the key to the vehicle.  It had extensive damage and has been in storage since that time.  There is no evidence before the court as to what explanation the person has for being in possession and having the key.  Smitherman stated in deposition that the person was not charged on that day, but there is no evidence as to whether he has ever been charged after that.

---

[3]  Consumers has not contended that the fact that the vehicle was recovered precludes recovery for damages to the vehicle from theft.  *See State Farm Mut. Auto. Ins. Co. v. Barrow*, 243 So.2d 376 (Ala. Civ. App. 1971).

**IV. DISCUSSION**

The court will begin with the grounds for summary judgment asserted as to Smitherman's breach of contract claim in Count I of the Complaint, and then will turn to the bad faith claims in Count II.

A.  Breach of Contract Claim

Smitherman made a claim under the Consumers policy for loss through theft of a covered vehicle.  "Theft" is not defined in the insurance policy.  "Theft" is not, however, an ambiguous term.  *See Nationwide Ins. Co. v. Rhodes*, 870 So. 2d 695, 696-97 (Ala. 2003) (stating that whether a contract is ambiguous or unambiguous is a question of law).  Alabama courts have interpreted "theft" in policies without finding that the term is ambiguous.  *See, e.g.*, *Chemstrand v. Maryland Casualty Co.*, 98 So. 2d 1, 4 (Ala. 1957).   Under Alabama law, "[i]n the absence of specific definition of terms contained in a policy, they are to be considered as of common usage, and ordinarily whether or not an automobile has been stolen within the meaning of the policy, is a question of fact for the jury."  *State Farm Mut. Auto. Ins. Co. v. Barrow,* 243 So.2d 376, 381 (Ala. Civ. App. 1971).   Under *Chemstrand*, to constitute "theft" within the meaning of an insurance policy, a "taking must be made with the felonious intent on the part of the taker to deprive the owner of the property."  98 So.2d at 4.

Consumers relies on case law to argue that theft is committed when a person knowingly obtains and exerts unauthorized control over property of another with the intent to permanently deprive the owner of his property.   Smitherman has responded that under current Alabama criminal law, as adopted in 1980, a person who retains a vehicle for a period beyond the specified period for which he is given permission to possess the vehicle can be guilty of theft.

To analyze these positions of the parties, the court first examines a pre-1980 case relied on by Consumers, and then examines and applies Alabama law on theft.

1. The *Salter* Case

Consumers relies on *Salter v. State Farm*, 379 So. 2d 600, 601 (Ala. Civ. App. 1979), in which the court addressed the relevance of a parent's testimony where the parent wanted to testify that he had not given a third party consent to possess his vehicle, but the parent had given consent for use of a vehicle by a child.  The court reasoned that the failure to consent to the child's loan of the vehicle to a third party does not establish theft, and that the consent or non-consent of the daughter, not the father, was relevant. *Id.*  In that case, there was no evidence as to the daughter's consent, and no theft charges had been brought against the third party. Consumers argues that, under *Salter*, because Callis consented to the use of the vehicle by a person named George, and George had the key to the vehicle and was using it when it was recovered, and charges for theft were never filed against him, there was no theft.

 While Consumers has argued that the vehicle was ultimately recovered from the person named George and no charges were pressed against him, the portion of Smitherman's deposition which is cited by Consumers in support of that argument only states that the vehicle was recovered from "a guy" with the key, but it does not state that the vehicle was recovered from a person named George, or from a person to whom Callis loaned the car.  (Doc. #17 page 103 at p.47:10-48:6).   During the same portion of his deposition, Smitherman was asked whether he knew whether Callis's version of the events that he loaned the car or that the car was stolen from the dry cleaners was true, and Smitherman said he did not know which was true.  (Id. at p. 45:16-46:2).   The court cannot conclude, therefore, that evidence cited establishes that the person from

whom the vehicle was recovered had permission from Callis to possess the car.

More fundamentally, however, regardless of the date of the decision in relation to the Alabama Criminal Code, the court cannot conclude that *Salter* controls in this case.  In *Salter*, the child had unlimited permission to possess the vehicle, so testimony that the father had not given the ultimate possessor permission to possess the vehicle was irrelevant.  There was no issue of whether the child had stolen the car from the parent.  In this case, Callis, unlike the child in *Salter*, exceeded the scope of permission given by his father.  Therefore, the court cannot conclude that summary judgment can be granted to Consumers on the breach of contract claim based on *Salter*.  Instead, the court will examine Alabama law on the issue of intent relevant to "theft" in an insurance policy.

### 2.  Alabama Law on "Theft" in the Insurance Context

As noted earlier, Smitherman relies on Alabama Criminal Code statutory definitions to support opposition to summary judgment in this case.  Alabama Code § 13A-8-2 defines "theft of property" as occurring when a person "knowingly obtains or exerts unauthorized control over the property of another, with intent to deprive the owner of his or her property."  The Alabama Criminal Code defines "obtains or exerts unauthorized control" as taking, carrying away, or the sale of, or possession of property including, but not limited to, conduct previously known as various forms of common law larceny.  Ala. Code § 13A-8-1(7).  "Deprive" is defined as meaning in part to "withhold property or cause it to be withheld from a person permanently **or** for such period or under such circumstances that all or a portion of its use or benefit would be lost to him or her . . . ."  Ala. Code § 13A-8-1(2) (emphasis added).  Under the criminal statute, intent to withhold permanently is not required.

10

Consumers counters in its Reply brief[4] that this court ought not look at Alabama criminal law in interpreting the insurance contract.

The applicability of the Alabama Criminal Code in the insurance context is an issue discussed, but not definitively settled, in Alabama law.  In some decisions, Alabama courts have indicated that the Alabama Criminal Code is relevant to the interpretation of "theft" in an insurance policy.  In 1979, the Alabama Supreme Court applied old common law distinctions between types of larceny as distinguished from "theft," but then noted that those distinctions were eliminated in the Criminal Code to become effective January 1, 1980, and stated "losses caused by 'theft' as defined by the new Criminal Code will be covered under policies insuring against 'theft.'"  *St. Paul Fire & Marine Ins. Co.*, 377 So. 2d 962, 964 (Ala. 1979).  The Alabama Court of Civil Appeals subsequently applied the definition of "theft" in the Criminal Code in interpreting an automobile theft insurance policy.  *See Cashatt v. State Farm Mut. Automobile Ins. Co.*, 510 So. 2d 831, 833 (Ala. Civ. App. 1987).

Alabama cases have also held, however, that "theft" would be understood according to "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Liggans v John Deere Ins. Co.*, 575 So. 2d 567, 570 (Ala. 1991) (quoting Appleman, *Ins. Law and Practice*, Rev. Vol. 13, §§ 7383, 7384, pp. 30-103 (1976)).  In *Liggans*, an insured argued that because the insurance policy did not define "theft," the definition had to come from the Alabama Criminal Code, and had to include theft by deception.  The court stated that it did not have to "reach the question of the applicability of statutory criminal law definitions" because, citing a rule of construction, theft would be understood according to "the

---

[4] Consumers' Reply brief was untimely, but the court has considered it.

meaning which would be attached by an ordinary person of average understanding if purchasing insurance." *Id.* (quoting Appleman, *Ins. Law and Practice*, Rev. Vol. 13, §§ 7383, 7384, pp. 30-103 (1976)).  The rule of construction cited by the *Liggans* Court distinguished the ordinary meaning from a "restricted meaning acquired in legal usage."  *Id.*

The Alabama Supreme Court has subsequently reiterated that the court should not "define words it is construing based on technical or legal terms."  *Safeway Ins. Co. of Ala., Inc. v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005).  The issue in that case was whether an exclusion for loss by "false pretenses" applied, which is not at issue in this case.[5]

As noted earlier, the *Chemstrand* definition of "theft," cited by Consumers, is "a taking . . . with the felonious intent . . . to deprive," while the statutory definition of "theft," relied on by Smitherman, requires intent to "withhold" property permanently or for such a period that all or a portion of its use would be lost to the owner.  At least for purposes of this case, the distinction between the *Chemstrand* ordinary meaning of "theft" and the statutory definitions appears to be a distinction without a difference.[6]  In *Deep v. State*, 414 So., 2d 141, 149 (Ala. Crim. App. 1982), a criminal defendant argued that the use of "exerts unauthorized control" and "deprive" in

---

[5] Consumers's citation to *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Dyer*, 454 So. 2d 921, 925 (Ala. 1984), does not seem to further this analysis, as it relates to the inapplicability of tort and criminal law presumptions in defining policy terms.

[6] The court notes that the Alabama Criminal Code does not define "theft" as broadly as Smitherman has done at certain points in this case.  Smitherman took the position in correspondence with Consumers that his son's unauthorized used of his vehicle is an offense which fell within the theft provisions of Ala. Code § 13-8-11 and, therefore, was a covered "theft."  (Doc. #19-12).  That argument is unavailing for purposes of this litigation because the Commentary to Ala. Code §13A-8-11, states that the section proscribes unlawful use of a motor vehicle without the owner's consent when the defendant is not guilty of theft.  Alabama courts also have held that the unauthorized use of a vehicle is not a lesser included offense of theft.  *See Gholston v. State*, 57 So. 3d 178, 183 n.1 (Ala. Crim. App. 2010).

the Alabama Criminal Code creates an overbroad statute which could be violated by temporarily borrowing a lawn mower without permission.  The Alabama Court of Criminal Appeals stated that Ala. Code § 13A-8-2 would not apply to a person who borrowed a lawn mower without permission, because he does not intend to withhold the property.  *Id.* at 149.  The court explained, "as under the old theft laws, one who obtains authorized *possession* might be punished if and when he exerts unauthorized *control*."  *Id.* (emphasis in original).  The court explained that the focus of the statute was on the intent of the thief to deprive the owner of property. *Id.*

In view of the *Deep* court's interpretation of the statutory definitions, and the equating of that interpretation to prior law,  this court will examine the evidence presented to determine if there is sufficient evidence of intent to deprive Smitherman of property on the part of Callis.

Smitherman argues that intent must be established by circumstantial evidence, which is sufficiently present in this case to create a jury question.  He relies, in part, on evidence that Callis had been given limited permission, he did not return the vehicle within the prescribed period of time, Callis told different versions of what happened with the vehicle,[7] Callis was not cooperating in the investigation, and was not communicating with his father after he failed to return the vehicle, as evidence which a reasonable jury could conclude establishes an intent to deprive Smitherman of possession.

In the context of a criminal prosecution, the Alabama Court of Criminal Appeals found a

---

[7] The court notes that Smitherman told Hemrick that his son told the police the car had been stolen from where he parked, but there is no police report which reflects that version of events.  Smitherman stated in his deposition that Callis's uncle told Smitherman, and that Callis himself said, that Callis had parked the car at a dry cleaners, lost the key, and when he returned to get the car, it was not there.  (Doc. #17 at 101-02).

question of fact as to intent where a defendant fled from the police in a vehicle, and argued that she had no intention of keeping the truck and only used the truck to flee, because the defendant refused to get out of the locked truck even when it drove over an embankment. *Hoobler v. State*, 668 So. 2d 905 (Ala. Crim. App. 1995) (stating that "[i]ntent is a jury question."); *see also Fuller v. State*, 472 So. 2d 452 (Ala. Crim. App. 1985) (question of fact where defendant said he did not intend to keep property without permission, but took property without first obtaining permission).

Although Consumers relies on Callis's telling the police that he had loaned the vehicle to a person named George to establish that he did not intend to deprive Smitherman of his vehicle, that was not the only version of the events as told by Callis. Callis told his uncle and father that the car was stolen from where he parked it. Callis told Sloan that he thought George was just going to the store, but the vehicle was out of Callis's possession for a substantial period of time, and Callis did not report the vehicle stolen.  When contacted by the police in response to Smitherman's complaint, Callis said that he loaned the vehicle to an African American man named George about whom he had no other information. Additionally, the evidence supports the conclusion that Callis avoided contact with his father, and Callis was initially uncooperative during the investigation of the insurance claim. Viewed in a light most favorable to the non-movant, the court agrees that the evidence of Callis's actions could allow for a reasonable inference that Callis had intent to deprive Smitherman of his vehicle, and summary judgment is due to be DENIED as to the breach of contract claim.

Additionally, even if a jury were to find that Callis gave permission to George to use the vehicle without intent to deprive Smitherman of the vehicle, the court cannot agree with

Consumers that there is no evidence of intent to deprive on the part of George.  The transcript of the recorded conversation between Sloan and Callis reveals that Callis told Sloan that George said he was going on a five minute errand to a gas station, but George did not return the vehicle.[8] Therefore, the court concludes that summary judgment is due to be DENIED as to the breach of contract claim on this alternative basis.

### B.  Bad Faith Claims

To establish bad faith failure to pay an insurance claim, a plaintiff has the burden of proving:

(a) An insurance contract between the parties and a breach thereof by the defendant;

(b) An intentional refusal to pay the insured's claim;

(c) The absence of any reasonably legitimate or arguable reason for that refusal (the absence of a debatable reason);

(d) The insurer's actual knowledge of the absence of any legitimate or arguable reason;

(e) If the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim.

*National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179 (Ala.1982).  Requirements (a) through (d) are normal bad faith and requirement (e) is for an "abnormal" bad faith case.  *See Employees' Benefit Ass'n v. Grissett*, 732 So. 2d 968, 976 (Ala. 1998).  In this case, having concluded that

---

[8] As noted above, the court cannot conclude on this record that the fact that no theft charges were pressed when the vehicle was recovered is dispositive of the scope of any supposed permission given by Callis because the summary judgment evidence does not establish that the person from whom the vehicle was recovered is the person to whom Callis gave the vehicle.

there are issues of fact which preclude summary judgment as to the breach of contract claim, the court turns to the parties' arguments as to the remaining elements.

In the "normal" bad faith case, the plaintiff must show the absence of any reasonably legitimate or arguable reason for denial of a claim. *State Farm Fire & Cas. Co. v. Slade*, 747 So.2d 293, 306 (Ala. 1999). To recover under a theory of "abnormal" bad faith, the plaintiff must show "(1) that the insurer failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review and (2) that the insurer breached the contract for insurance coverage with the insured when it refused to pay the insured's claim." *Slade*, 747 So.2d at 318. "Abnormal" bad faith can consist of: 1) intentional or reckless failure to investigate a claim, 2) intentional or reckless failure to properly subject a claim to a cognitive evaluation or review, 3) the manufacture of a debatable reason to deny a claim, or 4) reliance on an ambiguous portion of a policy as a lawful basis for denying a claim. *Id.* at 306-07.

In his response brief, Smitherman states that he "primarily presents an abnormal case of bad faith," and he does not present any argument regarding a normal bad faith claim. (Doc. #20 at p.22). Summary judgment is, therefore, due to be GRANTED as to his normal bad faith claim. *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994) (stating that grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned) (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir.1986)). This is consistent with the court's earlier finding that, in effect, there is an arguable position for Consumers, as well as Smitherman, to take to the jury as to whether the facts constitute "theft" of the vehicle.

In support of his abnormal bad faith claim, Smitherman relies on components two and

16

four of abnormal bad faith, as listed above; namely, that Consumers intentionally or recklessly failed to properly subject his claim to cognitive review and/or Consumers relied on an ambiguous term as a lawful basis for denying his claim.

As to the theory that Consumers relied on the construction of an ambiguous term, Smitherman argues that "theft" is broad and encompasses numerous types of takings.  The Alabama Supreme Court, however, has applied "theft" in an insurance policy without finding it ambiguous.  *See Chemstrand v. Maryland Casualty Co.*, 98 So. 2d 1, 4 (Ala. 1957).  Therefore, the court concludes that this theory is unavailing, and summary judgment is due to be GRANTED as to this aspect of the abnormal bad faith claim.

As to the reckless failure to subject the claim to cognitive review theory of abnormal bad faith, Smitherman argues that the initial denial was based on Callis being uncooperative, even though there is no requirement in the policy that a thief participate in an investigation of "theft" under the policy.  Smitherman also argues that the initial denial was made before any legal definition of "theft" was consulted, even though Consumers knew it needed an Alabama-specific interpretation of that term, and that when Consumers finally did consult Alabama law, it consulted the wrong statute, and should have realized that the facts of this case fell within the definition of "theft."  Smitherman's theory is that Consumers made an uninformed decision that no "theft" was involved within hours of learning of the claim, and stuck with that decision no matter what additional evidence was presented to it.

Consumers states that there is no abnormal bad faith because Consumers did not fail to cognitively review, but instead made inquiries the same day the claim was made, obtained statements from Smitherman and Callis, talked with the Montgomery Police Department, and

then compared the information compiled to the Alabama statute on theft.

One issue which is unresolved in this case is when Consumers made the initial decision to deny the claim. In its Reply brief, Consumers states that the time at which the initial denial was made is not in the file materials. When asked about the date of the initial decision to deny the claim in his deposition, Sloan answered that it was sometime prior to February 13, but that Sloan could not tell from the claim log when the decision was made. (Doc. #19-19 at p.62:10-63:1).

The significance of the issue of when the initial decision to deny the claim was made is that under Alabama law, "post-denial efforts to develop facts that would support a good-faith denial of the claim could not be used to overcome an initial denial made in bad faith." *Ex parte Simmons*, 791 So. 2d 371, 380 (Ala. 2000) (citing *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050 (Ala. 1987)).

The claim log notes that Hemrick spoke with Smitherman at 9:35 a.m. on January 24, and the recorded statement shows that the initial interview began at approximately 9:26 a.m. Hemrick notes at 9:37 that Smitherman cannot press charges because the police would not let him because he let his son borrow his car. The next entry is at 2:45 p.m. Hemrick noted that she was sending the "ror" (Reservation of Rights) and would call Smitherman to tell him that "this does not meet the definition of theft and until I speak to [Callis] we will close the file." (Doc. #17 at p.89). The "Reservation of Rights Letter" sent to Smitherman is dated January 24, 2012, and states that Consumers is investigating the claim, but also states at the end that "this loss is not considered a theft." (Doc. #19-3 p.2). Hemrick spoke with Smitherman again at 3:18 p.m. and noted "I again explained to the insd that until his son cooperates I will have to close this

claim, but I will call the police officer to see if I can find out anything."  (Doc. #17 at 89).

At 3:25 p.m. Hemrick spoke to Sergeant Hall of the Montgomery Police Department and noted that Sergeant Hall had been told by Callis that Callis lent the vehicle to someone named George, and that Sergeant Hall could not issue a warrant or theft report because of the lack of cooperation and information.

At 3:44 p.m. on January 24, Hemrick noted as follows: "Please close subro and file.  This does not meet the definition of a theft."  (Doc. #17 at p.88).

Although Consumers argues that the file was merely closed, and the claim was not denied at that point, the evidence set out above is sufficient for a jury to conclude that the initial decision to deny the claim was made by 3:44 p.m. on January 24.  The inference that a decision had been made by Hemrick to deny the claim at 3:44 p.m. on January 24 is also supported by the subsequent log entry for February 13, entered after the Reservation of Rights letter was sent, which states that a "formal denial" letter is needed because "[a]ttaching wording at the end of ROR does not meet the requirement." (Doc. #17 at p.87).  *See National Ins. Ass'n v. Sockwell*, 829 So. 2d 111, 132 (Ala. 2002) (stating, "Although the denial letter made the basis of this action was not formally issued until September 1998, Sockwell presented evidence indicating that the decision to deny the claim was made as early as May 18, 1998, while National was purportedly still investigating Sockwell's claim.").

 The court will, therefore, examine the evidence of the scope of the investigation and review of the claim by Consumers as of 3:44 p.m. on January 24, to determine whether there is a material issue of fact as to whether Consumers subjected the claim to cognitive review prior to the initial decision to deny.  *See Mutual Serv. Cas. Ins. Co. v. Henderson*, 368 F.3d 1309, 1316

(11th Cir. 2004) (noting factual questions regarding exactly when the denial of coverage occurred and stating that summary judgment could not be granted if there are questions of fact as to the failure to investigate before any one of the possible denial letters).

The Alabama Supreme Court has explained that an intentional or reckless  failure to properly subject a claim to a cognitive evaluation or review can be established if there is a "reckless indifference to facts or to proof . . . ." *Aetna Life Ins. Co. v. Lavoie*, 505 So.2d 1050, 1053 (Ala. 1987).   The Alabama Supreme Court has also determined that if a coverage decision is made without "the benefit of critical information needed to make such a determination," a reasonable jury could find that the "claim was not properly investigated and [the insurer] exhibited a reckless indifference to the facts in evaluating the claim."   *Standard Plan, Inc. v. Tucker*, 582 So. 2d 1024, 1031 (Ala. 1991).  Reliance on an incomplete investigation can also establish "reckless indifference to the facts."  *See United Services Auto. Ass'n v. Wade*, 544 So. 2d 906, 913-914 (Ala. 1989).

If a jury concluded that the initial decision to deny the claim was made by 3:44 p.m. on January 24, when Hemrick noted "please close subro and file," at that point, Hemrick had spoken with Smitherman and Sergeant Hall, and had learned that Callis had given two different versions of what had happened with the vehicle, one of which included that the vehicle was stolen from where it had been parked and the other was that he loaned the car.  Hemrick was aware that the vehicle had been missing for 18 days.  So, she knew at that time that Smitherman had loaned the vehicle to Callis to be returned by 9:00 that night, that under one version Callis said that the vehicle had been stolen, and under another version Callis said that he lent it to "George."  Hemrick also noted after her discussion with Sergeant Hall of the Montgomery Police

Department that the lack of cooperation and information about George meant that Sergeant Hall could not "issue a warrant or theft report."  (Doc. #17 at p.88).   A reasonable interpretation of Hemrick's understanding of her conversation with Sergeant Hall is that Callis engaged in unauthorized use, and there was not enough information to issue any warrant or theft report. Hemrick had attempted to speak with Callis, but found him to be uncooperative.  Viewing the facts in a light most favorable to the nonmovant, Consumers determined that the claim did not constitute a "theft" because Smitherman had loaned the car to Callis, without speaking to Callis, without attempting to reconcile Callis's conflicting stories, *cf. White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 349-50 (Ala. 2006) (finding question of fact as to bad faith claim where plaintiff argued that the adjuster did not subject the claim to cognitive review because he failed to reconcile an estimate from an inexperienced adjuster with other estimates), and without considering the uncooperative Callis's intent.  Therefore, a genuine issue of material fact has been created as to whether Consumers recklessly failed to subject the claim to cognitive evaluation or review.

Even if the jury were to conclude that the decision to deny Smitherman's claim initially was made when Sloan spoke with Callis, based on the statement in the Reservation of Rights letter that the file would be closed until Consumers spoke with Callis, the conversation with Callis also occurred on January 24.  At 4:08 p.m. on that day, Sloan noted that he received a call from Callis and "updated file."  During that conversation, Sloan spoke to Callis and heard his explanation of the loan of the vehicle, including that Callis thought the person to whom he loaned it, George, was only going to use the vehicle for a five minute errand.  As noted earlier, Consumers was aware that the vehicle had not been returned for 18 days.

21

Viewing the evidence in a light most favorable to the nonmovant, a reasonable inference could be drawn that even after speaking with Callis, Consumers maintained its initial position, as expressed to Smitherman, that there was no theft because Smitherman gave Callis permission to use the vehicle, even though that permission was limited in time, and without considering the purported scope of permission which Callis gave George, which Callis said was for a specific purpose within a very limited time.

Consumers has argued that it subjected the claim to cognitive review in part because it consulted legal authorities, but the evidence reveals that no authorities had been consulted either at the time Hemrick noted at 3:44 p.m. that the file would be closed, or when Sloan spoke to Callis on January 24.   In the transcript of the conversation between Sloan and Callis on January 24, Sloan said that he had to consult "with legal," which suggests both that he had not yet consulted legal sources, and that there was a need to consult legal authorities to evaluate the claim.  The notation in the claim log on January 24 at 4:08 p.m. by Sloan states that he called "DA Wells and LM for him to call me to see if any cases in state with similar facts were looked upon as thefts," but there is no indication in the log that Sloan received a report on any cases that day, or any other day.[9]  Immediately after that notation, Sloan made a note to Hemrick to "call NI and explain ROR as facts do not support definition of theft."  (Doc. #17 at p.88).  Hemrick and Sloan later consulted law.com, on January 25, and Ala. Code §13A-8-3 on February 13,

---

[9] The court also notes that while Consumers has relied in brief on *Salter v. State Farm*, 379 So. 2d 600, 601 (Ala. Civ. App. 1979) in support of its motion, no evidence has been pointed to at this point in the proceedings that Consumers relied on that case in reaching its decision to deny coverage.  The court further notes that Consumers does not assert an "advice of counsel" defense among its 38 affirmative defenses.

2012 (Id. at p.87-8), after the date on the Reservation of Rights letter.  (Doc. #19-11 p.2).[10]

     Consumers contends that the charge of "unauthorized use" by the police against Callis is legal authority that there was no theft by Callis, pointing to the portion of the phone conversation between Hemrick and Sergeant Hall in which he states that Callis's possession of the vehicle was not theft because Callis had permission to have the vehicle. (Doc. #19-8 at p.2).  That portion of the conversation did not address George's possession of the vehicle, nor was Sergeant Hall asked about the conflicting report that the car had been stolen from Callis.  Viewed in a light most favorable to the nonmovant, Hemrick's notes indicate that her understanding of Sergeant Hall's conversation with her to be that unauthorized use was the only charge that could be made because of the lack of information about George.  (Doc. #17 at p.88) (noting that Sergeant Hall "can't issue a warrant or *theft* report because of lack of cooperation and information.") (emphasis added).  The Reservation of Rights letter was apparently issued without waiting for any requested report on case law, or without consulting legal resources. Consumers's initial denial, therefore, appears to have been made without subjecting the claim to review under Alabama law.  *See Nat'l Ins. Ass'n*, 829 So. 2d at 132 (noting that jury could have found the adjuster recklessly disregarded facts and proof where adjuster "never even attempted to discern which of those elements of loss were not covered under Alabama workers' compensation law . . .).

     Assuming the claim was denied at some point on January 24, viewing the facts in a light

---

[10] Smitherman has also argued that these legal sources were not the appropriate resources to consult because, among other reasons, Consumers did not review the Alabama statutory definition of theft in Ala. Code § 13A-8-2, a section immediately preceding the section Consumers noted in the claim log.  Therefore, the evidence of this aspect of the review of the claim may also be relevant to abnormal bad faith, as evidence of Consumers's attempts to bolster its initial decision to deny the claim.

most favorable to the non-movant, a jury reasonably could find that Consumers's actions were more than negligence or bad judgment, but were reckless, so summary judgment is due to be DENIED as to the abnormal bad faith claim. *See Mut. Serv. Cas. Ins. Co.*, 368 F.3d at 1316 n.3, 1317-18 (requiring a showing of recklessness in investigating the claim, while holding that summary judgment could not be granted to the insurer on claim that a first denial letter was in bad faith).

Consumers has cited the court to *Singleton v. State Farm Fire & Casualty Co.*, 928 So. 2d 280 (Ala. 2005), for the proposition that bad faith is not simply bad judgment or negligence, but it imports a dishonest purpose, which means a breach of a known duty of good faith and fair dealing, through some motive of self-interest or ill will, which has not been proven in this case. In *Singleton*, the adjuster denied a claim for a new roof without consulting with roofers. In upholding summary judgment on the bad faith claim, the Supreme Court noted that the insureds sent the adjuster additional information in the form of estimates for replacing the roof, which the adjuster took into account. In *Singleton*, the court expressly noted that the plaintiffs did not contend that the subsequent action by the insurer after the initial denial was irrelevant to the bad faith claim. *Id.* at 285 n.2. In this case, however, Smitherman is arguing that the initial denial was in bad faith, which distinguishes this case from *Singleton*. This court concludes that the facts of this case, under similar analysis of recklessness in the Eleventh Circuit's decision in *Mutual Serv. Cas. Ins. Co.*, would allow for a jury to conclude that Smitherman's claim was initially denied in bad faith through a reckless failure to properly subject the claim to a cognitive evaluation or review.

## V. CONCLUSION

The court has carefully considered the arguments and evidence submitted by the parties. As discussed, there are questions of fact which arise from there being two different explanations offered by Callis for the loss of the car, and from uncertainty as to the time of the initial decision to deny the theft claim by Consumers which, when combined with all of the evidence viewed in a light most favorable to the nonmovant, preclude summary judgment as to both the breach of contract claim, and the abnormal bad faith claim through the reckless failure to properly subject Smitherman's claim to a cognitive evaluation or review in the denial of the claim.

Accordingly, it is hereby ORDERED as follows:

1.  The Motion for Summary Judgment (#17) is DENIED as to the Plaintiff's breach of contract claim in Count I, and as to the Plaintiff's claim for abnormal bad faith through a reckless failure to properly subject the claim to a cognitive evaluation or review in Count II.

2.  The Motion for Summary Judgment is GRANTED, and judgment is entered in favor of Consumers Insurance USA, Inc. and against Gary Smitherman on the Plaintiff's claims in Count II for normal bad faith, and for abnormal bad faith based on any theory other than abnormal bad faith through a reckless failure to properly subject the claim to a cognitive evaluation or review.

Done this 6th day of March, 2013.


/s/ W. Harold Albritton
W.  HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE